'O'

JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| LYUBOMIR MIHAILOV YORDANOV | ) | Case No. CV17-2034-CAS |
| | ) | |
| Petitioner, | ) | |
| v. | ) | |
| | ) | **ORDER** |
| WARDEN L.J. MILUSNIC | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

On January 18, 2017, Magistrate Judge Charles F. Eick entered an order certifying that Petitioner Lyubomir Mihailov Yordanov could be extradited to Bulgaria to face trial on charges of deceit. Case No. 2:16-cv-00170-CAS-E (Doc. 54) (hereinafter, "Extradition Order"). On March 14, 2017, Yordanov filed a petition for habeas relief under 28 U.S.C. § 2241. Doc. 1. The next day, he filed an ex parte application to stay extradition proceedings pending resolution of the habeas petition, and a memorandum in support of the habeas petition. Docs. 3, 4. The Court granted Yordanov's petition to stay. Doc. 8. The government filed an opposition to Yordanov's habeas petition (Doc. 6); Yordanov elected not to reply. For the reasons that follow, the Court denies the habeas petition and vacates the stay.

-1-

# I. BACKGROUND

## A. Governing Law

Upon the filing of a sworn complaint by a U.S. attorney, a magistrate judge may hold an extradition hearing with respect to any person within his jurisdiction who is charged by a foreign government of having committed a crime that is extraditable under a treaty or convention. 18 U.S.C. § 3184; *see Santos v. Thomas*, 830 F.3d 987, 991 (9th Cir. 2016). Such a hearing is akin to a grand jury investigation; its purpose is not to determine guilt, but merely to determine "whether there is evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, or, in other words, whether there is probable cause." *Santos*, 830 F.3d at 991 (quoting *Vo v. Benov*, 447 F.3d 1235, 1237 (9th Cir. 2006). "Given the limited nature of extradition proceedings, neither the Federal Rules of Evidence nor the Federal Rules of Criminal Procedure apply." *Id.* at 992. Rather, documents "shall be received and admitted as evidence" if they are "properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped." 18 U.S.C. § 3190. The fugitive generally is not permitted to present evidence, unless such evidence "'explains away or completely obliterates probable cause.'" *Santos*, 830 F.3d at 992 (citation omitted). If, after considering the evidence presented, the magistrate judge finds probable cause to extradite, he *must* issue a certification of extraditability. 18 U.S.C. § 3184.

The relevant treaty in this case is the Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Bulgaria, Case No. 2:16-cv-00170-CAS-E (Doc. 10 at 26–46) ("Extradition Treaty"). It provides generally for the extradition of an individual charged with an offense that is "punishable under the laws in both States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty." *Id.* at Art. 2(2).

/ / /

/ / /

### B. Extradition Proceedings

Yordanov, an individual residing in the United States, faces charges of criminal deceit in the town of Plovdiv, Bulgaria. Case No. 2:16-cv-00170-CAS-E (Doc. 10-1 at 6). Bulgaria has requested that the U.S. Government extradite Yordanov pursuant to the Extradition Treaty between the two countries. On December 15, 2015, the Government filed a sealed "Complaint for Arrest Warrant and Extradition" against Yordanov. Yordanov was arrested three days later. On January 8, 2016, the United States filed a complaint seeking Yordanov's extradition on behalf of the Government of Bulgaria. Yordanov opposed and filed a motion to dismiss the complaint. On November 10, 2016, Judge Eick held a hearing. On January 18, 2017, Judge Eick denied the motion to dismiss and certified that Yordanov was subject to extradition.

### C. Evidence

In the extradition proceeding, Bulgaria offered the following evidence: a criminal information prepared by S. Pencheva, Public Prosecutor for the City of Plovid; a witness statement of the victim, Yordanov Vasilev Angelov; and two witness statements of Angelov's associate, Atanas Ivanov Bubarov. Yordanov offered his own evidence.

*1. Pencheva Statement*

The criminal information prepared by Pencheva contains the following allegations:

- Angelov was the owner and manager of "SMM" PLCC, a company that imported and sold cars in Bulgaria.

- Angelov met Yordanov in February 2008. Yordanov represented that he was in the business of importing cars to Bulgaria from the United States, and expressed a desire to go into business with Angelov. The two men entered an oral agreement to collaborate on this project.

- Initially, Yordanov performed his obligations under the oral agreement. Yordanov would send invoices to Angelov describing a vehicle, Angelov would transfer the purchase price to Yordanov in the United States, and Yordanov would ship the purchased vehicle by container to Bulgaria.

- In May 2008, Yordanov decided "that he [was] going to send to the witness Angelov data about vehicles, which actually he was not going to buy, thus motivating the witness to transfer money for the purchase." Yordanov's intent was to use the transferred money "for his own necessities."

- Between May 2008 and August 29, 2008, Yordanov sent Angelov invoices for nine vehicles that he intended to purchase for sale to Angelov. During this same time period, Angelov transferred $870,439.43 to Yordanov's bank to cover the purchase price and Yordanov's commission.

- When the vehicles did not arrive in Bulgaria, Angelov repeatedly called Yordanov to inquire as to why the deliveries were late. Yordanov attempted to explain away the delay, and later sent Angelov container numbers in which the vehicles were allegedly going to ship. Angelov determined that the container numbers existed but that the containers were not going to ship. Angelov made further attempts to call Yordanov but Yordanov either refused to answer or offered an excuse and quickly ended the conversation.

- Angelov then flew to the United States, accompanied by Atanas Ivanov Bubarov—Angelov's best man and the godfather of his children—to determine why the delivery had been delayed. Yordanov assured Angelov that the vehicles were set to sail from New York at any moment.

- Angelov and Bubarov returned to Bulgaria to await the shipment. They soon discovered that the vehicles had not shipped and that Yordanov had never purchased them at all.

- At this point, Bubarov returned to the United States to meet with Yordanov. At the meeting, Yordanov confessed that he had never purchased the vehicles he invoiced to Angelov and never had any intention of doing so. He further admitted that he had kept the transferred money for himself and spent it on his personal needs.

Case No. 2:16-cv-00170-CAS-E (Doc. 10-1 at 6–8).

///

///

### 2. *Angelov Statement*

On March 14, 2013, Angelov offered a statement before the Regional Court of Plovdiv. According to the statement:

- Angelov met Yordanov in 2008. Yordanov said he was the owner of a company called ID Emerson based in California. The two men entered an agreement, pursuant to which Angelov would tell Yordanov which cars he was interested in, Yordanov would buy the cars and transport them to Bulgaria, and Angelov would pay the purchase price and a commission.

- Angelov began purchasing about 20 to 30 cars per month, ultimately purchasing about 100 cars. Angelov would send Yordanov the specifications for the car, Yordanov would find a car matching the specification and issue an invoice, Angelov would transfer funds, and Yordanov would buy the car.

- Between May 23, 2008 and August 29, 2008, Yordanov invoiced Angelov for nine cars (seven BMWs and two Mercedes), and Angelov paid the purchase price, about $640,000. After these cars did not arrive, Angelov called Yordanov to inquire about the status of the shipment. Yordanov "deciev[ed]" Angelov, stating that it would take a month and a half to acquire the appropriate documents for the car.

- After another month, Yordanov decided to travel to Los Angeles with Bubarov. Yordanov told Angelov that the nine missing cars were in containers in New York. Angelov expressed a desire to see the cars in person, but Yordanov stated that they were already in containers. Angelov then asked for the container numbers. Yordanov provided two numbers. Angelov checked online and found that the containers did exist. However, when he checked the status of the containers a week later, he found that the shipment had been cancelled.

- When Angelov found out that the shipment had been cancelled, he contacted Yordanov again. Yordanov said he would check to see what had happened. Angelov sent Bubarov back to the United States. "During this visit . . . Yordanov said that he did not buy the cars but used the money for his own purposes."

- Yordanov sent Angelov an email, stating that he would repay Angelov for the nine cars within six to twelve months. Yordanov's mother, who is also based in the United States, transferred $2,000 to Angelov. After a year passed with no further payments, Angelov contacted the Prosecutor's Office.

Case No. 2:16-cv-00170-CAS-E (Doc. 43-3 at 3–4).

   3. *Bubarov Statements*

On April 30, 2010, Bubarov offered a statement before an investigator for the City of Plovid's Ministry of the Interior. According to this statement:

- Bubarov shares an office with Angelov, and is familiar with everything happening in his office.

- Bubarov recalls that in 2008, Angelov was introduced to Yordanov. Sometime later, Bubarov was also introduced to Yordanov. Bubarov knew that Angelov and Yordanov were working together to import cars from the United States. He had the impression that the business was going well. As far as Bubarov knew, Yordanov would send an invoice for a certain car with its chassis number and then Angelov would transfer the funds to purchase the specified car.

- At some point, there was a significant delay in transferring a number of very expensive cars. Bubarov accompanied Angelov to the United States because he had better English skills than Angelov. The two met Yordanov, who told them that there were some technical problems but that the cars would be shipped soon. Yordanov told them that the cars were being held at the New York harbor. Yordanov convinced them not to travel to New York to inspect the vehicles.

- Angelov and Burbarov returned to Bulgaria, but they never received the cars or a notice of shipment. Angelov asked Burbarov to return to the United States, and he did. Bubarov met Yordanov again and began questioning him about the cars. Yordanov told Bubarov that he never bought the cars, but gave no explanation for what he had done with the money. "He started talking evasively, promising to return the money he owed."

Case No. 2:16-cv-00170-CAS-E (Doc. 43-1 at 2–4).

On March 14, 2013, Bubarov offered a second statement before the Regional Court of Plovdiv. Much of the statement is duplicative of his first statement. However, Bubarov did elaborate on his second meeting with Yordanov in Los Angeles. According to Bubarov, Yordanov admitted in this meeting that he did not acquire the nine vehicles "because he ha[d] some payments to make." *Id.* (Doc. 43-2 at 4). Yordanov then sent an email stating that he had received the money but not purchased the cars, and that he was going to refund the money by the end of the year. *Id.* The only payment Bubarov is aware of is the $2,000 transfer made by Yordanov's mother. *Id.*

### *4. Yordanov's Evidence*

Yordanov offered an untranslated email and various documents purporting to show completed vehicle purchases and deliveries made pursuant to his oral agreement with Angelov. *Id.* (Doc. 39-1).

## II. STANDARD OF REVIEW

Because Congress has not created a mechanism for appealing a certification of extraditability, the only way to challenge such a certificate is to bring a habeas petition. *Santos*, 830 F.3d at 1001 (quoting *Vo v. Benov*, 447 F.3d 1235, 1240 (9th Cir. 2006)). In reviewing such a petition, the district court is limited to considering whether:

> (1) the extradition magistrate had jurisdiction over the individual sought, (2) the treaty was in force and the accused's alleged offense fell within the treaty's terms, and (3) there is 'any competent evidence' supporting the probable cause determination of the magistrate.

*Id.* (quoting *Vo*, 447 F.3d at 1240). The extradition court's conclusions of law are reviewed de novo, while its factual findings are reviewed for clear error. *Id.* Procedural rulings—e.g., whether to allow discovery or to enforce briefing deadlines—are reviewed for abuse of discretion. *Quinn v. Robinson*, 783 F.2d 776, 817 n.41 (9th Cir. 1986).

## III. ANALYSIS

Yordanov objects to the Extradition Order on three bases. First, he argues that Bulgaria failed to comply with the Extradition Treaty because it failed to provide a

coherent, authenticated translation of the charging statute. Second, he argues that the Government has not established dual criminality. Third, he argues that the Government has not shown probable cause.

### A. Translation Issues

Article 8(2)(c) of the Extradition Treaty provides that "[a]ll requests for extradition shall be supported by . . . the text of the law or laws describing the essential elements of the offense for which extradition is requested and the applicable penalty or penalties." Article 9 provides that documents bearing the certificate or seal of the Bulgarian Ministry of Justice "shall be admissible in extradition proceedings" in the United States "without further certification, authentication, or other legalization." Article 10 provides that "[t]he request for extradition and all documents submitted by the Requesting State in support of the request shall be accompanied by a translation into the language of the Requested State, unless otherwise agreed."

In its original request for extradition, the Government provided the following translation of Bulgarian Criminal Code § 209(1):

> Who, with the purpose of obtaining for himself or for somebody else property benefit, arises or maintains aberration in somebody, thus causing him or somebody else property damage shall be punished for fraud by imprisonment from one to six years.

Case No. 2:16-cv-00170-CAS-E (Doc. 10-1 at 46). Yordanov argued in his opposition that this translation was unintelligible. The Government then produced a new, unauthenticated translation of the statute. Yordanov sought to dismiss the extradition proceeding on the grounds that the original translation was unintelligible and the new translation was untimely and unauthenticated. Following the November 10, 2016 hearing, Judge Eick granted the Government leave to file an authenticated version of the new translation. The Government did so.[1] Judge Eick accepted this translation, ruling

---

[1] The new translation provides:

that "the timing of the presentation and authentication of the new translation is not fatal to the merits of the Request for Extradition" because "[t]he Treaty does not necessarily require that all documents submitted in support of a request for extradition be submitted at the same time as the request itself." Extradition Order at 5.

In his habeas petition, Yordanov argues that the Extradition Order should be overturned because the Government's failure to provide a timely, coherent translation of the statute violated various requirements of the Extradition Treaty. The Court does not agree. Article 8(2)(c) provides that a request for extradition must be supported by the text of the law, and Article 10 provides that such a request must be accompanied by a translation of the charging statute. The Government satisfied these requirements by including in its initial request the authenticated text of the charging statute and an authenticated translation thereof. Case No. 2:16-cv-00170-CAS-E (Doc. 10-1 at 47). The original translation was admittedly unclear, but the Government addressed this concern by providing a revised translation, which it eventually authenticated. *Id.* (Doc. 50 at 4). Yordanov does not point to anything in the Extradition Treaty prohibiting supplementation. Accordingly, whether to permit such supplementation was a question committed to the sound discretion of the extradition court. Yordanov does not explain why it was an abuse of discretion to permit supplementation here.

Yordanov attempts to analogize this case to *In re Extradition of Ferriolo*, 126 F. Supp. 3d 1297 (M.D. Fla. 2015), but that case is distinguishable. In *Ferriolo*, Italy sought to extradite an Italian citizen who had been convicted *in abstentia* of two drug trafficking offenses. *Id.* at 1299–1300. The Government provided an incomplete English

---

> A person who for the purpose of acquiring material benefit for himself or another evokes or maintains in somebody a misleading idea, and thereby causes material damage to that person or to another, shall be punished for deceit by imprisonment from one to six years.

Doc. 50-1 at 4.

-9-

translation of the charging statute in the extradition request. *Id.* at 1301. The Government acknowledged that the relevant extradition treaty required a full translation, and sought to introduce an unauthenticated Google translation of the provisions not included in the original request. *Id.* The Court refused to consider this translation because it was not authenticated by a certificate or seal of the Italian Ministry of Justice, as required by the relevant treaty. *Id.* Here, by contrast, both the original translation and the revised translation bear the seal of the Bulgarian Ministry of Justice. That is sufficient to establish admissibility under the Extradition Treaty.

**B. Dual Criminality**

The Extradition Treaty incorporates the principle of dual criminality, pursuant to which "no offense is extraditable unless it is criminal in both countries." *Matter of Extradition of Russell*, 789 F.2d 801, 803 (9th Cir. 1986) (citation and quotation marks omitted); *see* Extradition Treaty, Art. 2(2) (to be extraditable, an offense must be "punishable under the laws in both States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty.").[2] To determine whether dual criminality exists, courts consider whether the *underlying conduct* is subject to criminal sanction in both countries. *See Manta v. Chertoff*, 518 F.3d 1134, 1141 (9th Cir. 2008) ("Dual criminality exists if the 'essential character' of the acts criminalized by the laws are 'substantially analogous.'") (citation omitted); *Emami v. U.S. Dist. Court*, 834 F.2d 1444, 1450 (9th Cir. 1987) (dual criminality exists if the "substantive conduct each statute punishes is functionally identical"). It is not necessary to show that the elements of the foreign offense are identical to those of the domestic offense. *See Manta*, 518 F.3d

---

[2] Although many extradition treaties—including the one at issue here—require dual criminality, the principle has no freestanding basis in U.S. law. *See Matter of Assarsson*, 687 F.2d 1157, 1163–64 (8th Cir. 1982) ("If the extradition treaty so provides, the United States may surrender a fugitive to be prosecuted for acts which are not crimes within the United States.") (quoting *Gallina v. Fraser*, 278 F.2d 77, 79 (2d Cir. 1960)). In all instances, the treaty language controls. *Id.* at 1164.

at 1141; Extradition Treaty, Art. 2(3)(a) ("[a]n offense shall be considered an extraditable offense . . . regardless of whether the laws in the Requesting and Requested States place the acts or omissions constituting the offense within the same category of offenses or describe the offense by the same terminology").

In the United States, either a state or federal criminal statute may be used to satisfy the dual criminality requirement. Where a federal criminal statute is used, an element of the crime that is purely jurisdictional—i.e., a requirement that the defendant use facilities affecting interstate or foreign commerce—may be disregarded for purposes of the dual criminality analysis. *See Emami*, 834 F.2d at 1450; *see also* Extradition Treaty, Art. 2(3)(b) ("an offense shall be considered an extraditable offense . . . regardless of whether the offense is one for which United States federal law requires the showing of such matters as interstate transportation, or use of the mails or of other similar facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States Federal court").

In the extradition proceeding, the Government argued that the requirement of dual criminality was satisfied because the alleged conduct could be charged under California's grand theft statute, Cal. Penal Code § 487(a), or the federal wire fraud statute, 18 U.S.C. § 1343. Yordanov argued that dual criminality was lacking because neither the grand theft statute nor the wire fraud statute applies extraterritorially. He further argued that Bulgarian Criminal Code § 209(1) could not be used to establish dual criminality because it is too broad and does not contain a falsity or reliance element. Judge Eick rejected these arguments. Yordanov reasserts them on appeal.

### 1. *Extraterritoriality*

Article 2(4) of the Extradition Treaty provides:

If the offense has been committed outside the territory of the Requesting State, extradition shall be granted, subject to the other applicable requirements for extradition, if the laws of the Requested State provide for the punishment of an offense committed outside its territory in similar

circumstances. If the laws of the Requested State do not provide for the punishment of an offense committed outside its territory in similar circumstances, the executive authority of the Requested State, at its discretion, may grant extradition provided that all other applicable requirements for extradition are met.

Yordanov argues that dual criminality does not exist because neither California nor federal law provides for punishment of fraud committed outside its territory. That is not correct. Courts have repeatedly held that the wire fraud statute admits of extraterritorial application. *See United States v. Georgiou*, 777 F.3d 125, 137 (3d Cir. 2015) ("Section 1343 applies extraterritorially"); *United States v. Kim*, 246 F.3d 186, 188–90 (2d Cir. 2001) (section 1343 prohibits fraudulent use of the U.S. telecommunication system, regardless of where the perpetrator is located). And although there does not appear to be any authority on whether California's grand theft statute applies extraterritorially, courts have held that the State may apply its criminal laws to a person outside of California who directs fraudulent communications to a person in the State. *See People v. Chapman*, 55 Cal. App. 192, 199 (1921) (Massachusetts resident who made obtained money under false pretenses from a person in California was subject to criminal liability in California); *see also Ex parte Hammond*, 59 F.2d 683, 685 (9th Cir. 1932) ("the offense of obtaining money under false pretenses is committed . . . where the victim parts with his money as a result of the false pretenses"). The requirement under the first sentence of Article 2(4)—that "the laws of the Requested State provide for the punishment of an offense committed outside its territory in similar circumstances"—is satisfied here. Even if it were not, Yordanov could be extradited under the second sentence of Article 2(4), which grants the United States discretion to extradite a fugitive even if its laws "do not provide for the punishment of an offense committed outside its territory in similar circumstances."

### 2. *Bulgarian Criminal Code § 209(1)*

Yordanov argues that Bulgarian Criminal Code § 209(1) cannot be used to establish dual criminality because it "appears to cover conduct that would not be covered

under U.S. statute." Doc. 4 at 30. This argument is without merit. It is not necessary that the foreign and domestic statutes be identical in scope; all that is necessary is that the charged conduct fall within the area of overlap between the two statutes. *See Manta*, 518 F.3d at 1141; Extradition Treaty, Art. 2(3)(a).

Yordanov further argues that § 209(1) cannot be used to establish dual criminality because it lacks a falsity or reliance requirement. This argument fails for two reasons. First, § 209(1) does appear to require falsity and reliance; the offense requires that the defendant "evoke[] . . . in somebody a misleading idea . . . thereby caus[ing] material damage to that person . . . ." Second, it is not necessary that the foreign and domestic crime contain the same elements, as long as the underlying conduct is criminal in both countries. *Manta*, 518 F.3d at 1141; Extradition Treaty, Art. 2(3)(a).

### 3. Wire Fraud Statue[3]

Yordanov argues that he cannot be liable under the wire fraud statute because there is no evidence that he used the wires. That argument is meritless, for two reasons. First, use of the wires is a jurisdictional element, which need not be present to establish dual criminality. *See Emami*, 834 F.2d at 1450; *see also* Extradition Treaty, Art. 2(3)(b). Second, a defendant need not herself use the wires in order to commit wire fraud: she may be "held liable for a communication transmitted by a victim of her fraud, if the communication furthered the defendant's fraudulent scheme." *United States v. Deavers*, 617 F. App'x 935, 937 (11th Cir. 2015). There is evidence that Yordanov caused the

---

[3] Yordanov is subject to extradition if the alleged conduct is chargeable under either California's grand theft statute or the wire fraud statute. Yordanov's only argument against finding the alleged conduct chargeable under California's grand theft statute is that the statute supposedly lacks extraterritorial effect. The Court has already rejected that argument. Because Yordanov is clearly chargeable under California's grand theft statute, it is not necessary to decide whether Yordanov's conduct would also be chargeable under the wire fraud statute. Nonetheless, the Court will reach this question, as it provides an alternative basis for finding dual criminality.

victim in this case to wire money to him in foreign commerce. Such evidence is sufficient to establish use of the wires.

Yordanov also argues that the wire fraud statute cannot be used to establish dual criminality because it requires a finding of fraudulent intent, and the evidence does not support such a finding.[4] Judge Eick found it reasonable to infer that Yordanov acted with fraudulent intent, based on evidence that:

> (1) Yordanov did not ship nine vehicles for which Angelov had sent Yordanov money; (2) when Angelov assertedly came to this country to discuss the missing shipments, Yordanov, knowing he had not purchased the subject vehicles, allegedly provided continuing, false assurances of performance; and (3) Yordanov later told Bubarov that Yordanov had not purchased the subject vehicles and that Yordanov had used the money obtained from Angelov for Yordanov's own purposes.

Extradition Order at 30–31 (footnote omitted).[5] The Court has reviewed the evidence in the record and concludes that Judge Eick's finding is supported by competent evidence and is not clearly erroneous. Accordingly, Yordanov's argument that there is no evidence of fraudulent intent must be rejected.

### C. Probable Cause

A request for extradition will not be granted unless there is probable cause to believe the fugitive committed the alleged offense. *See Santos*, 830 F.3d at 991; Extradition Treaty, Art. 8(3) (a request for extradition must be supported by "such

---

[4] Yordanov is correct that the wire fraud statute requires a showing of fraudulent intent. *See United States v. Chandler*, 98 F.3d 711, 715 (2d Cir. 1996) (a defendant does not commit wire fraud unless he acts with "intent to deceive and intent to cause actual harm").

[5] Judge Eick also correctly concluded that Yordanov's promise to repay the money transferred by Angelov would not preclude a finding of fraudulent intent. *See United States v. Treadwell*, 593 F.3d 990, 997 (9th Cir. 2010) (where the defendant is charged with violating the wire fraud statute, "a good-faith belief that the victim will be repaid and will sustain no loss is no defense at all") (citation and quotation marks omitted).

information as would provide a reasonable basis to believe that the person sought committed the offense for which extradition is requested"). Probable cause means "a prima facie case of guilt . . . sufficient to hold the extraditee for trial." *Emami v. U.S. Dist. Court for N. Dist. of Cal.*, 834 F.2d 1444, 1452 (9th Cir. 1987). An extradition court's finding of probable cause will be sustained if there is *any* competent evidence to support it. *Quinn*, 783 F.2d at 817 n.41.

Yordanov argues that the evidence submitted by Bulgaria is insufficient to establish probable cause. The Court does not agree. Judge Eick found probable cause for a prosecution under Bulgarian Criminal Code § 209(1) based on evidence that Yordanov "promised to purchase and ship the nine subject vehicles; received the money to do so; failed to do so; made false representations that he had done so; made false assurances that the vehicles were in containers in New York ready for shipment; and made false representations that he would see to it that the cars were shipped[,]" as well as evidence that "Yordanov used Angelov's money for Yordanov's own purposes and then lied about it." Extradition Order at 35. Judge Eick's finding is supported by competent evidence which is more than sufficient to establish a prima facie case of guilt under Bulgarian Criminal Code § 209(1).[6]

Yordanov contends that his evidence, which purportedly shows a course of legitimate dealings between Yordanov and Angelov, explains away Bulgaria's evidence. The Court does not agree. Yordanov's evidence is not inconsistent with Bulgaria's

---

[6] Yordanov argues that Bubarov's statements and Angelov's statement are inconsistent as to whether Yordanov used the transferred money for personal expenses. The Court does not see any inconsistency. *Compare* Case No. 2:16-cv-00170-CAS-E (Doc. 43-2 at 4) (Bubarov statement: Yordanov confessed that he did not purchase the vehicles "because he ha[d] some payments to make") *with id.* (Doc. 43-3 at 3) (Angelov statement: "Yordanov said that he did not buy the cars but used the money for his own purposes."). Even if the witness statements were inconsistent, it would not help Yordanov. The Court must affirm if there is *any* competent evidence supporting a finding of probable cause. *Quinn*, 783 F.2d at 817 n.41.

evidence; Pencheva, Angelov, and Bubarov all acknowledge that Yordanov initially performed his obligations under the oral agreement with Angelov. *See, e.g.*, Case No. 2:16-cv-00170-CAS-E (Doc. 43-3) (Angelov statement, acknowledging that he imported around 100 cars from Yordanov before the alleged fraud began). Nor does evidence of past performance under an oral agreement preclude a finding of criminal fraud where, as here, there is evidence that the defendant made fraudulent misrepresentations with respect to the particular transaction at issue.

## VI. CONCLUSION

For the foregoing reasons, Yordanov's petition for habeas relief (Doc. 3) is **DENIED**. The stay of extradition proceedings entered on March 21, 2017 (Doc. 8) is **VACATED**.

**IT IS SO ORDERED.**

DATED: April 18, 2017

*Christina A. Snyder*

CHRISTINA A. SNYDER
UNITED STATES DISTRICT JUDGE